**Opinion filed October 1, 2009**



In The

# Eleventh Court of Appeals

_____

## No. 11-08-00246-CR

_____

## JUAN JOSE PONCE, Appellant

## vs.

## STATE OF TEXAS, Appellee

**On Appeal from the 244th District Court**

**Ector County, Texas**

**Trial Court Cause No. C-34,397**

### O P I N I O N

After the jury convicted Juan Jose Ponce of six counts of aggravated sexual assault, it assessed his punishment at life imprisonment on each count. The jury also assessed a $5,000 fine on each count except for the second count. On the second count, the jury assessed a fine of $10,000. The trial court ordered that the sentence on the second count was not to commence until the sentence on Count One was concluded. It also ordered that the sentence on Count Three was not to commence until the sentence on Count Two was concluded. The sentences on the remaining counts were to run concurrently with the sentence on Count Three. We affirm.

Ponce presents us with six issues on appeal. In the first three of those issues, Ponce claims that his trial counsel was ineffective. In Ponce's fourth issue, he asserts that the trial court erred in connection with its ruling on a jury argument objection. Ponce makes legal and factual insufficiency arguments in his fifth and sixth issues.

We will first address the legal and factual sufficiency issues.

When we review a claim that the evidence is legally insufficient, we consider all of the evidence in the light most favorable to the verdict. We determine whether, based on that evidence and the reasonable inferences from it, any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979). When we perform a legal sufficiency review, we are not to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We determine whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Id*. at 417. To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Id*. We may not simply substitute our judgment for that of the factfinder. *Johnson v. State*, 23 S.W.3d 1, 12 (Tex. Crim. App. 2000). Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because evaluation of credibility and demeanor is often involved in the resolution of any conflicts. *Id*. at 8. Therefore, in matters concerning the weight and credibility of the evidence, we must give due deference to the factfinder's determinations. *Id*. at 9. When conducting a sufficiency review, we consider all the evidence admitted, whether properly or improperly. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).

The State presented evidence that A.S. was seventeen years old at the time of trial. When A.S. was five or six years old, Ponce began living with her mother. A.S. and her sister, Y.S., lived

2

with them. A.S. testified that, when she was in the second or third grade, Ponce began to watch her, as well as her sister, change clothes and take showers. When A.S. was six or seven years old, Ponce "ripped" her dress and tried to grab and rub her leg. Ponce beat her so many times that she could not remember the first time.

When A.S. was in the third or fourth grade, Ponce called her into his and her mother's bedroom, locked the door, started beating her, threw her onto the bed, tore off her shirt, put her hands up over her head, tried to kiss her breasts, took her pants off, all the while punching her and pulling her hair. He also penetrated her vagina with his penis.

A.S. testified that, after this first instance, Ponce warned her about saying anything to anyone. He discussed hurting her mom, her, her sister or "killing [her] or killing them and having [her] there the rest of [her] life, torturing [her]."

Later, according to A.S.'s testimony, Ponce began to stick various things such as bananas, carrots, glue sticks, or other items either in her vagina or her anus, while also penetrating the opposite opening with his penis. He also used a vibrator on her. A.S. told the jury that Ponce would make her watch pornographic videos and then make her do what the people on the videos were doing including oral sex. When asked how many times Ponce had sexually assaulted her, A.S. repeatedly said, "[T]oo many to count."

The sexual assaults, as described by A.S. (sometimes up to three times a day), continued until A.S. ran away in late February 2007. A.S. told the jury that that was when "Juan Ponce raped [her] for the last time."

On March 8, 2007, A.S. ended up at her uncle and aunt's house (the uncle was A.S.'s biological father's brother). A.S. had not seen them for some ten years, but she finally located them and made arrangements to go to their home. When A.S.'s aunt found out that A.S. was coming to her house, she called A.S.'s mother and A.S.'s mother went there. Because she was afraid that she would have to go back home, A.S. tried to run away again when she saw her mother. A.S. had to be physically restrained. She did not go home but, rather, continued to stay with her aunt and uncle for almost one year and five months, during which time she would wake up screaming and crying because of nightmares she was having. It was as A.S. was being restrained that A.S. first told her family about the sexual assaults. Then, her aunt called the police. After the police and Child

Protective Services had completed their interviews for the night, A.S.'s mother went home to Ponce. She did not "100%" believe the claims that A.S. was making, nor did she believe Ponce "100%" either.

A.S.'s mother told the jury that Ponce failed to come home on the following Monday night. A.S.'s mother did not hear from Ponce until nine days later. He told her that he had been attacked and was in a hospital in Tijuana, Mexico. Later, he was found at his mother's house in deep South Mexico. Fearing that personnel of the Child Protective Services would not let her see her daughters unless Ponce was in jail, A.S.'s mother worked with the police to entice Ponce to return to the United States. A.S.'s mother no longer had any doubts about A.S.'s story. When Ponce did agree to return, Ponce's brother took A.S.'s mother to the Mexican border. A.S.'s mother went into Mexico to get Ponce. When they tried to cross the border back into the United States, the authorities arrested Ponce.

Ponce testified and denied committing the offenses. He suffered from diabetes and high blood pressure and was not physically able to do the things of which A.S. accused him. These conditions also prohibited him from having regular sexual relations with A.S.'s mother. Ponce also said that the vibrator that A.S. referred to was used by her mother and that the videos to which A.S. referred were her mother's videos. He maintained that the trip he took to Mexico after A.S. made the accusations against him was to obtain treatment for his high blood pressure. He was also going to check on his mother; he had been told that she was very ill. He also claimed that A.S., A.S.'s mother, and A.S.'s aunt were framing him.

Ponce had never told anyone before, but when he was nine years old, he was selling bubble gum in his hometown in Mexico. Some "guys" who were smoking marihuana took his money. He hit one of them with some rocks. They grabbed him, and one of them put his penis "inside of [Ponce]." Therefore, he testified that he could never do anything like that to any other person because he knew what it was like. He said that he never told anyone about the assault until during his testimony because he "didn't want to be called a homosexual" and he was embarrassed by it. Ponce told the jury that, if he ever did anything like that, he "would take [his] life in front of your eyes."

4

Christin Abbott is a Sexual Assault Nurse Examiner (SANE) who had performed over 300 sexual assault examinations. She examined A.S. when A.S. was almost sixteen years old. She took a full history from A.S., and in that history, A.S. relayed much of the same information as she did in her testimony.

Abbott performed a physical examination of A.S. and testified that she found injuries to both the female sexual organ and the anus. The anal opening was abnormally large. According to Abbott, that meant that A.S.'s anus was "used to accommodating something of a larger size than just stool passing." She told the jury that typically it would take more than just one penetration to cause that problem. She also found trauma to A.S.'s female sexual organ. Because she had never seen an injury that completely extended as far as this one did, a doctor was asked to repeat the vaginal test four days later. The doctor agreed with Abbott's findings. Abbott said that this type of injury typically indicates sexual assault.

During the trial, the State introduced the results of DNA tests. A.S. testified that, at various times, Ponce took her to feed the dogs at his brother and sister-in-law's house; his brother and sister-in-law were in Mexico. Ponce repeatedly sexually assaulted her in that house. During the incidences at that house, he also repeatedly stuck a stick in her vagina. The stick was identified and admitted into evidence. After Ponce sexually assaulted A.S. at that house, he would clean himself with whatever might be available such as clothing or rags and put that material under the bed or in a pipe behind a water heater. A.S.'s aunt testified that she and A.S.'s mother went to that house and, as A.S. had told them they would, they found a rag and a shirt that they believed might contain Ponce's DNA. They notified police, and the police came and collected the items.

Sarah Rothwell is a forensic scientist with the Department of Public Safety Crime Lab in Lubbock. She received two towels, a piece of white toilet paper, a buccal swab taken from Ponce, and a buccal swab taken from A.S. She tested the toilet paper and the towels and confirmed the presence of semen on the items. She prepared samples from the areas where the semen was located and prepared them for analysis by a DNA analyst.

Daniel Lindley is a forensic scientist in the DNA section of the Texas Department of Public Safety Crime Laboratory in Lubbock. He performed DNA testing on the toilet paper, one hand

5

towel, the buccal swab taken from Ponce, the buccal swab taken from A.S., and a buccal swab taken from A.S.'s mother. Lindley testified at trial and also submitted his written reports.

Lindley reported that, to a reasonable degree of scientific certainty, Ponce was the source of the DNA profile taken from the epithelial cell fraction of a stain on the toilet paper. The probability of randomly selecting an unrelated person as the source of the profile was 1 in 624.2 quadrillion.

Lindley also obtained a DNA profile from sperm cell fractions on the hand towel and sperm cell fractions on the toilet paper. The two stains were consistent with another person's DNA being present. A.S. and A.S.'s mother were both excluded as contributors to this profile. However, Ponce could not be excluded as the contributor of the major component in this profile. The probability of randomly selecting an unrelated person as the source of the profile was 1 in 624.2 quadrillion. To a reasonable degree of scientific certainty, Ponce was the source of the DNA profile taken from the sperm cell fractions of the stains on the toilet paper and hand towel.

A partial DNA profile was taken from epithelial cell fractions on the hand towel. The profile was consistent with a mixture of different DNAs. A.S. and A.S.'s mother were excluded as contributors to this profile also. Lindley testified that it was possible that a female's DNA might not be present on these items even though that female might have had sexual intercourse with the major contributor. Ponce could not be excluded as a contributor to the epithelial cell fractions profile at ten different loci. However, at those loci, the probability of randomly selecting an unrelated person who could be a contributor to this profile is 1 in 7.143 million.

As relevant to this case, the elements of the offense of aggravated sexual assault, as charged in Counts One, Three, Four, Five, and Six of the indictment are set forth in TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (a)(2)(A)(ii) and (iii) (Vernon Supp. 2008). The only differences in any of these counts as charged in the indictment are the places penetrated, the means of penetration, and the manner in which death or imminent serious bodily injury would be inflicted and upon whom it would be inflicted.

In order to prove that Ponce committed the offense of aggravated sexual assault as charged in the indictment, the State had to show beyond a reasonable doubt that he intentionally or knowingly caused the penetration of the anus or sexual organ of a child by any means and that the complainant was younger than fourteen years of age. *See* Section 22.021(a)(1)(B)(i), (a)(2)(B). A complainant's

6

testimony alone is sufficient to support the jury's finding that sexual contact or penetration did in fact occur. *See Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978); *Tinker v. State*, 148 S.W.3d 666, 669 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

We have set forth the evidence in detail. Under the standards of review that we have set out earlier in this opinion, we hold that any rational juror could have found the essential elements of these offenses beyond a reasonable doubt. We further hold that the evidence is not so weak that the verdict of the jury is clearly wrong and manifestly unjust. Furthermore, the conflicting evidence does not so greatly outweigh the evidence supporting the convictions that the jury's determination is manifestly unjust. Therefore, we find that the evidence as set forth in this opinion is both legally and factually sufficient to support the verdict of the jury. Ponce's fifth and sixth issues are overruled.

During its jury argument, the State referred to Ponce as a "monster." In his fourth issue, Ponce complains of the trial court's failing to instruct the jury to disregard that argument. We note that the trial court overruled Ponce's objection to the argument. An objection must be perfected. The proper way to pursue an objection to an adverse ruling is to object, to request an instruction to disregard, and to request a mistrial. *Brooks v. State*, 642 S.W.2d 791, 798 (Tex. Crim. App. 1982). Ponce had his adverse ruling when the trial court overruled his objection to the argument. We will take the argument here to be that the trial court erred when it overruled Ponce's objection because the trial court would not have instructed the jury to disregard evidence that it had just admitted over objection.

The approved general areas of jury argument, within which all proper arguments must fall, are (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument of opposing counsel, and (4) plea for law enforcement. *Todd v. State*, 598 S.W.2d 286 (Tex. Crim. App. 1980); *Dunbar v. State*, 551 S.W.2d 382 (Tex. Crim. App. 1977); *Alejandro v. State*, 493 S.W.2d 230 (Tex. Crim. App. 1973). However, even if an argument exceeds the permissible bounds of proper jury argument, it will not necessarily constitute reversible error. We will find reversible error only when the argument is extreme, when it is manifestly improper, when it injects new and harmful facts into the case, or when it violates a mandatory statutory provision and is therefore so inflammatory that its prejudicial effect cannot reasonably be cured by an instruction to disregard the argument. *Long v. State*, 823 S.W.2d 259, 267 (Tex. Crim. App. 1991).

The complained of argument was improper. *Duran v. State*, 356 S.W.2d 937, 938 (Tex. Crim. App. 1962). A prosecutor should not refer to a defendant by any name other than his given name or nickname. It is improper to refer to a defendant by a derogatory term designed to subject him to personal abuse. *Schumacher v. State*, 72 S.W.3d 43, 49 (Tex. App.—Texarkana 2001, pet. ref'd). However, we do not think that reversal is mandated under this record. There is a difference "between harmless argument outside the record and arguments calculated to deprive the defendant of a fair and impartial trial." *Stein v. State*, 492 S.W.2d 548, 552 (Tex. Crim. App. 1973). The solitary mention of the word "monster" in this record was not an argument calculated to deprive Ponce of a fair and impartial trial. The argument was not extreme – the State mentioned the word only one time. The State did not, by the mention of the word, violate any mandatory statutory provisions. The State did not inject any new or harmful facts into the case. Further, in light of the evidence of guilt in this case, including the testimony of the victim, the evidence from the initial interviewers, the medical evidence, the evidence showing flight, and the corroborating evidence presented though A.S.'s mother and A.S.'s aunt, we cannot say that the error affected Ponce's substantial rights. *See* Tex. R. App. P. 44.2(b). The fourth issue is overruled.

In Issues One, Two, and Three, Ponce complains that his counsel was ineffective.

To prevail on a claim of ineffective assistance of counsel, an appellant must establish that his lawyer's performance fell below an objective standard of reasonableness and that there is a "reasonable probability" the result of the proceeding would have been different but for counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 693-94 (1984); *Mallett v. State*, 65 S.W.3d 59, 62-63 (Tex. Crim. App. 2001). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Hernandez v. State*, 726 S.W.2d 53, 55 (Tex. Crim. App. 1986). The purpose of this two-pronged test is to judge whether counsel's conduct so compromised the proper functioning of the adversarial process that the trial cannot be said to have produced a reliable result. *Thompson v. State*, 9 S.W.3d 808, 812-13 (Tex. Crim. App. 1999).

The review of defense counsel's representation is highly deferential and presumes that counsel's actions fell within a wide range of reasonable professional assistance. *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). Appellant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Jackson v. State*,

877 S.W.2d 768 (Tex. Crim. App. 1994); *Hayden v. State*, 155 S.W.3d 640, 648 (Tex. App.—Eastland 2005, pet. ref'd). When the record is silent on the motivations underlying counsel's tactical decisions, the appellant usually cannot overcome the strong presumption that counsel's conduct was reasonable. *Thompson*, 9 S.W.3d at 813. In order to defeat *Strickland*'s presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Id.* at 814 (quoting *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996)). We do not inquire into trial strategy unless no plausible basis exists for trial counsel's actions. *Johnson v. State*, 614 S.W.2d 148, 152 (Tex. Crim. App. 1981). When the record contains no evidence of the reasoning behind trial counsel's actions, we cannot conclude that counsel's performance was deficient. *Jackson*, 877 S.W.2d at 771.

Appellant did not file a motion for new trial.

Specifically, in his first issue, Ponce makes the claim that his trial counsel failed to conduct a proper voir dire examination of the jury panel in that he failed to challenge any of the jurors for cause and allowed biased jurors to serve on the jury. Ponce maintains that his trial counsel failed to tell the panel the names of any of the witnesses who might be called to testify, failed to delve into the relationships between any of those potential witnesses and the potential jurors, and failed to ask the jury whether those relationships would affect their ability to serve as fair and impartial jurors. Neither the State nor the trial court identified the witnesses either.

Ponce also asserts that his trial counsel failed to ask the jury panel whether any of them either were in law enforcement or had family members with law enforcement experience. The presiding juror of the jury was a member of law enforcement. He also knew A.S.'s mother; he had attended elementary school with her. He told the trial court that he had not had any recent contact with her except to greet her in passing from time to time. He also told the trial court that he could not even remember her first name. The trial court extensively examined this juror about any bias or prejudice he might have from his knowing A.S.'s mother. He unequivocally told the trial court that he could be fair and impartial. He said, "I'm a police officer for the State of Texas and I've arrested my own brother, so I think I'm a pretty fair person."

9

Ponce's trial counsel did ask the jury panel whether any of them knew people who had been the victim of a sexual assault. Although several members of the jury panel indicated that they were acquainted with people, either within or outside of their families, who had been victims of sexual assault, Ponce's trial counsel did not ask any further questions on the subject. One of the members of the jury panel revealed for the first time, to anyone, that she had been sexually assaulted. Trial counsel responded courteously to the panel member but asked her no questions. Trial counsel also asked the jury panel whether anyone knew anyone who had been falsely accused. Several members responded that they had known of persons who had been falsely accused.

The panel member who had been the victim of sexual assault had not told anyone about it. One of Ponce's avenues of defense was to claim that he would never commit such an offense because he had been assaulted and, like the panel member, had never told anyone. During the trial, the State took Ponce to task for never having told anyone. It is reasonable to assume that trial counsel could have left this person on the jury with the hope that she would understand and believe Ponce's failure to report his own alleged sexual abuse. Such a position is borne out by trial counsel's final argument to the jury:

> When we opened up asking questions of the jurors, we talked about reasonable doubt. We also questioned the jurors and I believe that lady sitting over there said that she had been sexually assaulted and never told anybody. I didn't ask her any more questions because I did not want to embarrass her.
>
> One of your own panel members said that she had been raped and never told anybody and I just felt so bad about that, having to ask that question of that lady. Is Mr. Ponce any different from that lady over there? Of course, he's not going to tell anybody. He's ashamed, doesn't want people to think that he's a homosexual.
>
> [The State] makes light of the fact that he just now brought that thing up. You saw the tears in his eyes when he said that. You saw the tears in his eyes when he said that in response to one of [the State's] questions.

After the testimony had begun, a juror informed the trial court that she had realized that her sister Mary Carrasco – A.S.'s counselor – would be a witness. Another juror separately informed the trial court that she had discovered that her sister-in-law – who had initially interviewed A.S. – was a witness in the case. Neither juror knew anything about this case or their relative's involvement in it. The trial court questioned these two jurors extensively regarding their ability to serve as fair

and impartial jurors. Only after the trial court was convinced of their ability to so serve did it continue with the trial. We also note that the two persons to whom the jurors were related were never called to testify.

Ponce argues that trial counsel's failure in these areas resulted in biased jurors serving on the jury. He has not shown that any of the jurors about which he complains were actually biased. The three jurors who knew witnesses testified that they were able to serve fairly and impartially. Neither has any actual bias been shown against the law enforcement officer who served on the jury and who had arrested his own brother.

Even if the doctrine of implied bias were applicable to the law enforcement officer in this case (and we do not hold that it is applicable), that would not establish that trial counsel could not have made valid strategical decisions to leave the allegedly objectionable juror on Ponce's jury. *See State v. Morales*, 253 S.W.3d 686, 698-99 (Tex. Crim. App. 2008). An appellate court should not second-guess legitimate strategic decisions made by trial counsel. *Id.* at 696. As the Court of Criminal Appeals has stated, "[U]nless there is a record sufficient to demonstrate that counsel's conduct was not the product of a strategic or tactical decision, a reviewing court should presume that trial counsel's performance was constitutionally adequate" unless the conduct "was so outrageous that no competent attorney would have engaged in it." *Id*. It was incumbent upon Ponce to present us with a record to overcome the strong presumption that trial counsel's conduct was reasonable. He has not. In the absence of such a record, and consistent with *Strickland*, "we must presume that counsel is better positioned than the appellate court to judge the pragmatism of the particular case, and that he 'made all significant decisions in the exercise of reasonable professional judgment.'" *Delrio v. State*, 840 S.W.2d 443, 447 (Tex. Crim. App. 1992) (citing *Strickland*, 466 U.S. at 690).

Even if we were to find that trial counsel provided ineffective assistance to Ponce, he has not established the second prong of *Strickland*: that there is a "reasonable probability" the result of the proceeding would have been different but for counsel's deficient performance. *Strickland*, 466 U.S. at 693-94; *Mallett*, 65 S.W.3d at 62-63. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. When we review the evidence presented to the jury, which we have outlined above, we cannot say that there is a reasonable probability that the result of the proceeding would have been different but for counsel's alleged deficient performance.

11

Confidence in the outcome of this trial was not undermined. Ponce's first issue on appeal is overruled.

Trial counsel's comments during voir dire regarding the state of the judiciary in Texas are the subject of Ponce's second issue on appeal. He claims that his lawyer's comments negatively affected his punishment. During voir dire, trial counsel said:

> The Court of Appeals Court in Philadelphia, the Judges are still wearing the long wigs, which is the way they treat the attorneys, the way that they are superb Judges. We have some wonderful Judges in Philadelphia. Sometimes, I cannot say the same thing for the State of Texas, it's another story, but those Judges in Philadelphia are chosen on merit. Here, we just choose them on whoever can make the most money and whoever can get on the right party, whichever party is in power at the time. So we don't always have the best Judges in the Court of Appeals, the Texas Court of Criminal Appeals, but I enjoyed working there.

Ponce argues that "it is reasonably likely that trial counsel's disparaging and totally inappropriate remarks caused [the trial judge] to exercise his authority" to stack two of the life sentences. We disagree. Trial counsel appears to be directing his remarks at the "Court of Appeals" or "the Texas Court of Criminal Appeals," and not at trial courts. However, Ponce argues that it is clear that the trial judge was personally offended by trial counsel's comments because, after a discussion between trial counsel and the trial court, the court stated, "But I'm just a lowly, dumb Texas judge, so I'm not really understanding your argument on the wide open scope of presenting evidence, I mean." We would think that there would be no doubt that trial counsel's statements would be something that would personally offend the trial court. But, Ponce's issue goes beyond that. His claim is that trial counsel's comments so enraged the trial court that it stacked two of the six life sentences imposed by the jury. The result, he claims, was that he received ineffective assistance of counsel.

We have set forth the standards by which we review claims of ineffective assistance. We review this claim by those same standards. Here, the statements made by trial counsel may have been unwise and ill-advised, but the record before us does not show that the making of them deprived Ponce of effective assistance of counsel. At most, the one remark by the trial court merely shows that it took offense at trial counsel's comments. It was up to Ponce to bring us a record that supported his claim. Without a record, we do not know why trial counsel made the statements that

12

he made, but even if we assume that in the making of them he deprived Ponce of effective assistance of counsel, the second prong of *Strickland* is not satisfied. On this record, we cannot say that there is a reasonable probability that the result of the proceeding would have been different but for counsel's alleged deficient performance. Confidence in the outcome of this trial was not undermined. Ponce's second issue is overruled.

The State filed a motion in limine to exclude testimony concerning the divorce action pending between Ponce and A.S.'s mother. During the cross-examination of A.S.'s mother, Ponce's trial counsel attempted to impeach A.S.'s mother on the grounds that she had a property interest in the outcome of the criminal trial due to the pendency of the divorce proceedings. The State objected, and the trial court admonished trial counsel at the bench and out of the hearing of the jury not to further violate the motion in limine. At the conclusion of A.S.'s mother's testimony, both the State and Ponce perfected bills of exception.

In his third issue, Ponce argues that trial counsel perfected a deficient bill of review by only addressing A.S.'s mother's criminal history and any possible extramarital affairs and not addressing the divorce action. Ponce alleges that he was harmed because trial counsel failed to develop testimony that would show bias.

The record does not support Ponce's contentions that trial counsel's actions fell below a reasonable standard. Nothing in the record reflects what A.S.'s mother's testimony would have been concerning the divorce action. She had already testified before the jury that she did have a property interest in the outcome of the trial. The record does not support Ponce's argument that, but for the bill of review that trial counsel perfected, there would have been a reasonable probability of a different outcome. The third issue is overruled.

As requested by Ponce, in reaching our decision in this case, we have not considered evidence that was not admitted in the trial court. We affirm the judgment of the trial court.


October 1, 2009                                          JIM R. WRIGHT

Publish. *See* TEX. R. APP. P. 47.2(b).                  CHIEF JUSTICE

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.


13