**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00132-CR**
_____

**WILLIAM DALE CARTER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 411th District Court**
**San Jacinto County, Texas**
**Trial Cause No. CR13937**

**MEMORANDUM OPINION**

William Dale Carter appeals his conviction for aggravated assault on a family member. Tex. Penal Code Ann. § 22.02(b)(1). Carter was indicted for causing serious bodily injury by shooting his brother-in-law, *Daniel*, in the chest with a revolver.[1] Carter complains on appeal that the prosecutor engaged in a course of

---

[1]To protect the victim's privacy, we use pseudonyms to refer to the victim and his wife. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

1

conduct calculated to deny him a fair and impartial trial, that the trial court denied his right to counsel by improperly restricting his closing argument, that the prosecutor denied him a fair and impartial trial by injecting extraneous, unproven offenses into the record, and that the trial court committed reversible error in the guilt phase jury charge by not defining the offense as a result-oriented offense. We affirm.

## Background

Given Carter's issues on appeal, we discuss only the testimony relevant to Carter's issues.

*Brenda Walker*

Brenda Walker is Carter's sister and the victim's wife. Brenda and Carter do not get along. Because of past verbal interactions with her brother, Brenda's attorney advised her to record her interactions with Carter "in case any threats were made or anything like that." Brenda recorded part of the incident for which Carter was indicted. Brenda testified she recorded the incident on her cell phone in her pocket but did not know of any video recording of the incident. The trial court admitted the audio recording at trial.

The property where the incident took place has been owned by Carter's and Brenda's family for years. Brenda, Daniel and Carter live on the same tract of land but have separate residences. Brenda denied the existence of an easement giving

2

Carter the right to use a road on her property to reach his house. Carter tried to get Brenda to sign a document giving him an easement, but neither she nor her husband signed anything granting Carter access. Brenda explained that just a few days before the incident, the parties went to court and "[had that motion dismissed] so that we could put a gate up…to stop whoever, anybody from coming through."

Brenda placed a "no trespassing" sign on her property which she testified was specifically for Carter. Brenda testified that Carter did not have the right to be on her property when the incident occurred and that she and Daniel made it clear to Carter that he had no right to be on their property.

On the morning of October 23, 2022, Brenda heard Carter's truck in her driveway. Carter went to the back of the property but came back through a pasture gate and approached Brenda's house. Brenda and Daniel walked out to the driveway to speak to Carter. Brenda testified that she did not walk out to inflict any injury or harm towards Carter. Neither Brenda nor Daniel had anything in their hands as they approached Carter.

Daniel pointed to the "no trespassing" sign and asked Carter if he saw it. Carter responded, "Do you see this, MF-er?" After Brenda heard Carter's response, she looked at Carter. She saw Carter with a gun, saw a flash, and heard the gun go off. Brenda turned to Daniel, who had "a little spot on his shirt." Daniel told Brenda

3

to "get down," and Brenda and Daniel started running towards their house away from Carter's truck.

When the couple reached their house, Daniel told Brenda that he was shot in the heart. Carter continued "to shoot at [Brenda and Daniel] as [they] were running into the house. So [Daniel] got his shotgun and ran outside to shoot back." Brenda then called 911. The evidence at trial showed multiple rounds of shots were fired into Brenda and Daniel's house.

Brenda explained to the jury that there was tension regarding the disposition of their parents' assets and that Carter was not named as a beneficiary of their parents' will, whereas Brenda was. Brenda also explained there was tension with Carter over his animals. Carter had a dog that was severely injured and appeared to be suffering. Brenda texted Carter about the dog, but Carter was working and could not tend to the dog, so Daniel shot the dog "to put it out of its misery." Brenda denied killing any of Carter's other animals and livestock.

On cross-examination, Brenda agreed that the easement and ownership of the family property was confusing, but that Carter does not need to use her driveway to get to and from his house. After her husband was shot, Brenda described how Daniel shot seven rounds at Carter's truck. Daniel came into their house and talked to the 911 operator when a shot came from Carter's house. Daniel told the 911 operator

4

that Carter was "shooting at us again, and he grabbed that Israeli shotgun and ran out and started firing back."

Brenda explained that when she approached the passenger side of Carter's truck, she did not have her phone in her hand. Her phone was either in her pocket or clipped to her pocket. She denied putting her phone through the passenger-side window. She made an audio recording of the incident but did not make a video recording. She denied ever making a video recording of Carter.

*Daniel*

Daniel testified that leading up to the shooting, Carter insisted on seeing his parents' will, which caused problems with the family. Daniel also explained that prior to the shooting, there had been disagreements about whether Carter had the right to be on Daniel and Brenda's property. Brenda's parents had lived down the road from Daniel and Brenda and had deeded one-third of their land to them. Initially, Carter was not upset about the transfer of the property, but he became upset when Daniel put a double-wide mobile home behind his in-laws' house, which required removing a section of fence. Daniel explained that he and Brenda were allowed to use the driveway because it was on their property. A surveyor asked Brenda and Daniel where they wanted the property line, but the line they chose became a "point of contention" with Carter because Carter "would state that I built

that driveway. That's my driveway." Daniel did not know if Carter's claims about the driveway were true, because Daniel was not around when it was built.

Daniel testified that neither he nor Brenda ever gave Carter any kind of easement but admitted that "Brenda had let him know that he could use the road as he needed to." According to Daniel, Carter had sued Brenda years earlier for access to the driveway, and a judge had issued an order allowing him to use it during their mother's lifetime, but she eventually passed away, and a few days before the shooting, Daniel and Brenda were granted a dismissal of the prior judge's order. Daniel then placed a "no trespassing" sign on a tree on their property. He believed the sign served as notification to Carter that he was not allowed to use the driveway anymore.

On the morning of the shooting, Daniel was making pancakes when he heard Carter drive through the property. Daniel testified, "I didn't want to stop what I was doing, so I figured [Carter] was going to do what he needed to do and I'd approach him on the way out[]" to let Carter know the "no trespassing" sign applied to him. When Brenda and Daniel heard Carter start his pickup truck, they walked out together and saw Carter driving slowly through the pasture. Neither Daniel nor Brenda had anything in their hands. Carter approached the couple with his passenger window down. Daniel walked up to the passenger window, pointed at the "no trespassing" sign, and asked, "Dale, did you see that sign?" Carter responded, "You

6

see this, motherf---er?" Daniel saw Carter point the muzzle of a gun at him and then realized that he had been shot.

Daniel testified that "it took a second to realize what had happened." He looked down and saw blood streaming out and told Brenda to "get down." They managed to get away from the truck, but Carter kept firing. The couple ran toward their house, and Daniel got his shotgun and told Brenda to call 911 because he "got shot in the heart."

Daniel went outside and fired seven rounds as Carter continued to fire at the couple. As Carter was leaving the driveway, Daniel reloaded and shot two more times. Daniel admitted shooting in the direction of house which was ninety to one hundred yards away. Daniel later discovered that his house had been "shot out" and that Carter had continued firing shots as Daniel and Brenda were trying to get inside.

Daniel testified that Brenda had an audio recording of the incident but did not videotape it.

*The Appellant*

Carter testified that he and Brenda started not to get along when she married Daniel. According to Carter, the controversy over the property "started just by intimidation." Daniel and Brenda wanted Carter to move off of the property and wanted "every inch of" the family property and "every dime" of his parents' money for themselves. Carter also testified that Daniel killed some of his animals.

7

Carter explained that on the morning of October 23, 2022, he was on the "easement" that he built "40 years ago" because that was the only way he could get to his property, and he needed to put horse feed in the feed room. As he was going back out of the driveway, Brenda and Daniel walked up to his truck, so he stopped, and Daniel and Brenda leaned against the open window of his truck. Carter testified that he observed Daniel "reaching towards around his back…straight toward the middle of his back where you normally keep one of those little hideaway guns at." Carter testified that he believed without a doubt that Daniel was reaching for a gun. Carter believed that he was "fixing to get killed if I didn't do something about it." In response, Carter pulled his gun from the console and shot Daniel in the chest. Carter believed that if he didn't shoot Daniel, he would "probably be dead right now."

After Carter shot Daniel, Brenda and Daniel turned around and ran. Carter said that Brenda still had her phone in her hand. Carter shot two more times into the ground. Carter then drove to his house and Brenda and Daniel kept shooting. Carter grabbed a lever-action rifle and shot in the direction of Brenda and Daniel's house in order to get them to stop shooting. After Daniel and Brenda stopped shooting, Carter backed out onto the highway and left.

Carter testified that Brenda "definitely" took a video on the day of the incident as Brenda frequently carries her phone in her right hand "videoing."

8

On cross examination, the State questioned Carter about his conviction and twenty-year sentence for home invasion in Illinois in 2002. The State also questioned Carter about his parents' will. Carter denied being cut out of his parents will, instead claiming that the most recent will gave Carter one-third of his parents' estate as they wanted. Carter claimed that the will Brenda probated is invalid. The State offered, and the trial court admitted, the application for probate and the last will and testament of Carter's father. Over objection from the defense, the trial court admitted a final summary judgment that a mortgage company obtained against Carter.

Issue One: Prosecutorial Misconduct

In his first issue, Carter complains that the prosecutor engaged in a course of conduct amounting to prosecutorial misconduct calculated to deny him a fair and impartial trial. To preserve a complaint of prosecutorial misconduct, a defendant must "(1) object on specific grounds, (2) request an instruction that the jury disregard the comment, and (3) move for a mistrial." *Penry v. State*, 903 S.W.2d 715, 764 (Tex. Crim. App. 1995); *see also* Tex. R. App. P. 33.1 (requiring as a prerequisite for a complaint on appeal that such a complaint was timely made to the trial court and that the trial court ruled on the complaint). The defendant's failure to object to prosecutorial misconduct at the earliest possible moment generally leaves the complaint unpreserved for appellate review. *See Penry*, 903 S.W.2d at 764. Therefore, to determine whether the various issues Carter claims as prosecutorial

misconduct were preserved for our review, we must examine the record to see whether and when Carter claimed prosecutorial misconduct, and whether the trial court ruled on any such complaint. *See id.*

In his appeal, Carter contends the State engaged in prosecutorial misconduct at six points during the trial. The first instance of alleged misconduct "involve[s] the evidence regarding whether Appellant had the right to be present at the location where the shooting occurred, which was an important element regarding Appellant's self-defense claim." Carter complains on appeal that Brenda and Daniel testified he did not have an easement to travel on the driveway where the shooting took place and that the couple obtained an order extinguishing the easement a few days before the incident because there was "no evidence being introduced showing that Appellant was aware of that order[.]" But Carter never objected to this testimony during the trial.

Carter further complains about the admission of State's Exhibit 46A – the application for probate and last will and testament of Carter's father – and the admission of State's Exhibit 46B – the summary judgment order in favor of a mortgage company. Carter did not object to Exhibit 46A, and his only objection to Exhibit 46B was "not relevant" to which the State responded:

> [The State]: My response is that, Judge, he portrayed himself as being run off the property by [Daniel] and [Brenda] when in fact a mortgage company got a judgment against him for defaulting on mortgage payments.

10

[Carter's counsel]: And there again, Judge, he was in possession of it. He wasn't evicted, so he's in possession of the property.

The trial court admitted State's Exhibit 46B. Carter failed to object to the testimony of Brenda and Daniel he identifies in his brief. Carter also failed to object to the admission of State's Exhibit 46A. Carter failed to bring his complaints to the trial court's attention and to seek a ruling on them. Although he objected to Exhibit 46B on the basis of relevance, he made no objection that the State was engaging in prosecutorial misconduct by offering the exhibit into evidence. Nor did Carter move for a mistrial or new trial on the basis that the State committed prosecutorial misconduct with respect to these issues. "We are not hyper-technical in examination of whether error was preserved, but the point of error on appeal must comport with the objection made at trial." *Bekendam v. State*, 441 S.W.3d 295, 300 (Tex. Crim. App. 2014). Because Carter failed to raise the issue of prosecutorial misconduct at any point while the trial court had the ability to address his complaint, he failed to preserve it for appellate review. Tex. R. App. P. 33.1(a)(1); *Hajjar v. State*, 176 S.W.3d 554, 566 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (addressing prosecutorial misconduct argument and concluding: "By failing to object on this theory at trial, appellant preserved nothing for our review.").

Carter contends that we should address his complaint even if he did not preserve it because the introduction of the evidence regarding his right to be on the

property was "akin to introducing false evidence before the jury, which is a violation of Appellant's right to due process." In *Compton v. State*, 666 S.W.3d 685, 731 (Tex. Crim. App. 2023) the Court of Criminal Appeals held that even prosecutorial misconduct that rises to the level of a due process violation may be subject to procedural default. The court declined to consider, either "separately or cumulatively," unchallenged instances of alleged misconduct. *Id.* Thus, "[a] due-process, fair-trial objection is required ... to preserve a complaint on appeal that the prosecutor engaged in serious and continuing prosecutorial misconduct so as to effectively deprive a defendant of due process or a fair trial." *Mullinax v. State*, No. 02-14-00237-CR, 2015 Tex. App. LEXIS 5409, at *3 (Tex. App.—Fort Worth May 28, 2015, pet. ref'd) (mem. op., not designated for publication) (citing *Clark v. State*, 365 S.W.3d 333, 339-40 (Tex. Crim. App. 2012)); *see also Taylor v. State*, Nos. 09-16-00303-CR, 09-16-00307-CR, 2018 Tex. App. LEXIS 3426, at **16-17 (Tex. App.—Beaumont May 16, 2018, pet. ref'd) (mem. op., not designated for publication). "The cumulative-error doctrine does not apply unless the complained-of errors have been preserved for appeal and are actually errors." *Schmidt v. State*, 612 S.W.3d 359, 372 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd) (citing *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999)). Since Carter failed to preserve error regarding the alleged incidences of prosecutorial misconduct,

we conclude there is no cumulative error or harm. *See Schmidt*, 612 S.W.3d at 372 (citing *Buntion v. State*, 482 S.W.3d 58, 79 (Tex. Crim. App. 2016)).

In his second subpoint, Carter complains that the State offered evidence regarding the details of Carter's conviction for home invasion as well as evidence for which Carter was acquitted. The State offered into evidence Exhibit 65, which included the information charging Carter with one count of home invasion and two counts of aggravated sexual assault, as well as the judgment order sentencing for the offense of home invasion. Carter initially objected to the State's questioning regarding the home invasion:

> [State]: You went to trial and had a trial and a jury found you guilty of home invasion. Do you remember that?
>
> [Carter]: Yes, I do. Part of it.
>
> [State]: In fact, if fact, if this is you, William D. Carter, 1/19/1953. That's you?
>
> [Carter]: Is that my birthday?
>
> [State]: Yes.
>
> [Carter's counsel]: Judge, I object to this. And he's already, he's already admitted he had that conviction. And so this is unnecessary and prejudicial, and object to it.
>
> [State]: None of this came out during direct. I'm just establishing the fact that he's the same person on this document because none of it came out.

13

The trial court overruled Carter's "unnecessary and prejudicial" objection, and when the State offered Exhibit 65 into evidence, Carter did not object. On appeal, Carter makes the additional argument that the admission of Exhibit 65 was a violation of Texas Rule of Evidence 609(a). Once again, Carter's objection on appeal does not comport with his objection at trial; therefore, nothing is preserved for our review on appeal. *See Bekendam*, 441 S.W.3d at 300; Tex. R. App. P. 33.1(a)(1).

In his third subpoint, Carter complains about comments the prosecutor made in the presence of the jury while responding to Carter's objection to the State's questions about the victim in the home invasion case.

[State]: Was that the victim on the case where you went to prison --

[Carter's counsel]: Excuse me.

[State]: -- in Illinois?

[Carter's counsel]: Excuse me, Judge, we've already been over that. It's admitted. He got a conviction, and the rest of this is immaterial and irrelevant. He's got a conviction. They got it in evidence.

[State]: The door is opened to his prior bad acts as it surrounds to this. Other threats made about on recordings and other threats made to other women. He portrayed himself judge as being framed, my dogs were being framed, my dogs were being terrorized, and this was [Daniel's] quote, modus operandi, habit, and all these other things. He's made a false impression to the ladies and gentlemen of the jury that he's some kind of innocent defenseless man where I have a mountain of evidence here that rebuts this defensive theory. So it's not just that I'm just going behind the conviction, but I have a number of extraneous acts here that

14

were committed at the hands of this defendant, not only to [Daniel] but to other women.

[Carter's counsel]: I'm going, I'm going to object to him going into that. None of that's in evidence at this point. They got one felony conviction that's in evidence. And going into the facts and so forth and so on is --

[Trial court]: Sustained.

[State]: I'm asking respectfully for a hearing outside the presence of jury.

After further discussion outside the presence of the jury, the trial court maintained its ruling sustaining defense counsel's objection to the details of the Illinois conviction. On appeal, Carter contends that "injecting matters that are outside the record, through jury argument, sidebar remarks or argument regarding an objection, is clearly improper" and that the prosecutor's remarks "show a willful and calculated effort on the part of the State to deprive Appellant of a fair and impartial trial." Because Carter did not object on the basis of prosecutorial misconduct as soon as possible after it occurred, he has not preserved the issue for our review. *See Penry*, 903 S.W.2d at 764.

In his fourth subpoint, Carter contends the State engaged in prosecutorial misconduct by calling him names on several occasions during closing argument. On appeal, Carter identifies five instances of name calling. First, the prosecutor referred to Carter as "a despicable piece of garbage[.]" Carter did not object to this comment. Second, the prosecutor called Carter "Mr. Tough guy." Carter did not object to this

15

name-calling. Third, the prosecutor called Carter "crazy. He's bat crazy." Carter did not object to this statement either. Fourth, the prosecutor referred to Carter as "[t]his long haul truck driving garbage[.]" Carter also did not object to this comment.

Because Carter did not object to the above identified comments which he complains of on appeal, he has not preserved his argument on appeal. *See* Tex. R. App. P. 33.1(a)(1). However, Carter did object to one of the instances of name-calling which he complains of on appeal. During closing argument, the following exchange occurred:

> [State]: And I could either do it now or I could do it after [defense counsel] speaks, and I commend [defense counsel]. We tried a clean case. [Defense counsel] is a good man, all right. But he drew a 2-7 offsuit in a Texas hold'em hand when it came to the facts of this case. There's been no hostility or animosity between us, and that's in this stressful being that we have a very healthy thing.
>
> So I commend [defense counsel], because [defense counsel] ensures that even despicable individuals like this selfish son of a bitch right here --
>
> [Carter's counsel]: Excuse me, Judge. I'm going to object to that reference and ask that be stricken.
>
> [Trial court]: Sustained. Stricken from the record.
>
> [Carter's counsel]: Ask the jury to disregard.
>
> [Trial court]: Jury should disregard.
>
> [Carter's counsel]: The rules require me to ask for a mistrial.
>
> [Trial court]: Denied.

16

From the context in which it was made, Carter's objection was sufficient to preserve his complaint for our review, and we agree that the complained of argument was improper. *See Ponce v. State*, 299 S.W.3d 167, 175 (Tex. App.—Eastland 2009, no pet.). Proper areas of jury argument include: (1) a summation of the evidence presented at trial; (2) a reasonable deduction drawn from that evidence; (3) an answer to opposing counsel's argument; or (4) a plea for law enforcement. *See Jackson v. State*, 17 S.W.3d 664, 673 (Tex. Crim. App. 2000). "A prosecutor should not refer to a defendant by any name other than his given name or nickname." *Ponce*, 299 S.W.3d at 175. "It is improper to refer to a defendant by a derogatory term designed to subject him to personal abuse." *Id.*

That said, "[r]emarks that fall outside the permissible bounds of jury argument are not constitutional errors." *Gilcrease v. State*, 32 S.W.3d 277, 279 (Tex. App.—San Antonio 2000, pet. ref'd). "Such remarks constitute 'other errors' that fall within Texas Rule of Appellate Procedure 44.2(b)." *Id.* (quoting Tex. R. App. P. 44.2(b). "We must disregard error that does not affect the accused's substantial rights." *Id.* To determine whether the State's improper argument affected Carter's substantial rights, we look to three factors: (1) the severity of the misconduct, (2) measures adopted to cure the misconduct, and (3) the certainty of conviction absent the misconduct. *Id.*

17

Here, the State referred to Carter as a "son of a bitch" one time, and Carter promptly objected. Although the State referred to Carter as other names during closing argument, Carter did not object to any of these names. The trial court promptly gave an instruction to disregard the prosecutor's comment, and we presume the jury followed the trial court's instruction. *See Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998). In the absence of anything in the record to rebut this presumption, we conclude the trial court's careful and prompt instruction to the jury to disregard the prosecutor's remarks was sufficient to cure any harm the remarks might have caused. *See Galloway v. State*, 716 S.W.2d 556, 557 (Tex. App.—Waco 1986, pet. ref'd). Accordingly, we cannot say that the prosecutor's improper name-calling denied Carter the right to a fair and impartial trial, nor that it affected Carter's substantial rights. *See* Tex. R. App. P. 44.2(b).

In his fifth subpoint, Carter complains that the prosecutor made improper objections to Carter's closing argument which were incorrectly sustained by the trial court. As part of Carter's fifth subpoint, he complains of the following objection made by the State:

> [Carter's counsel]: But let's say there's a lot of dispute about this whole case. One side thinks this, the other side thinks that. We're not going to get that resolved here by this jury. That's a whole another case. Probably --

> [State]: I object to that. Because it has been resolved. It wasn't his property it was their property, and I object.

[Carter's counsel]: That's a jury question, Judge.

[State]: Actually, it's not. There's nothing in here about a property dispute. Nothing. I respectfully object to this.

[Trial court]: This is defense's argument.

Although the State's objection was not sustained and the trial court did not prevent Carter's counsel from making further arguments about the existence of a "property dispute," Carter complains on appeal that the State's objection "is still trying to falsely use those exhibits [the will and the summary judgment], on top of the alleged extinguishment of the easement, for which there was no evidence to show Appellant had received notice, to prove Appellant didn't have any authority to be on the property." To preserve an issue for appellate review, a party must make a timely and specific objection and obtain an adverse ruling. *Id*. 33.1(a)(1)(A). The record does not contain a ruling that was adverse to Carter on this issue, and Carter did not object to the State's objection on the grounds that it constituted prosecutorial misconduct. Therefore, there is nothing preserved for our review.

Each of the State's objections to Carter's jury argument which was sustained and about which Carter complains on appeal is also asserted, in his second through fifth issues, as constituting a denial of his right to counsel. Because there was no objection to prosecutorial misconduct in any of these exchanges, we conclude Carter's prosecutorial-misconduct complaints were not preserved for our review,

19

and we will address them separately as denial-of-counsel issues in Carter's second through fifth issues, below.

In his sixth subpoint, Carter complains of following statements made by the prosecutor during closing argument:

- "The brother-in-law that had given this defendant notice not to come on to the property. The brother-in-law who said who verified he was cut out of the will."

- "Who is trespassing? Him." … "[Carter] goes over to [Daniel] and Brenda's house knowing he wasn't supposed to be there."

- "Even now, and I mentioned to you during jury selection, and I know it's been a long three days with proper pleadings and proper proof, here it is. Proper proof. It's in evidence. He went to the pen in Illinois for home invasion. Not possession of a gun, not possession of drugs, but it's right here. A 20-year sentence. I don't care if he didn't do all of it or not, but it speaks for itself."

Carter did not object to any of these arguments, whether based on prosecutorial misconduct or otherwise. The issue is not preserved for review on appeal. *Id*. 33.1(a)(1); *Hajjar*, 176 S.W.3d at 566 (addressing prosecutorial misconduct argument and concluding: "By failing to object on this theory at trial, appellant preserved nothing for our review.").

We overrule Carter's first issue.

Issues Two through Five: Denial of Counsel by Limiting Jury Argument

In issues two through five, Carter complains that the trial court denied his right to counsel by improperly restricting his closing argument by sustaining the State's objections to his arguments. We review a trial court's rulings on the State's objections to Carter's jury argument for abuse of discretion. *See Davis v. State*, 329 S.W.3d 798, 825 (Tex. Crim. App. 2010). The trial court has broad discretion in controlling the scope of the closing argument, and the trial court abuses its discretion if its decision is arbitrary or unreasonable. *Wilson v. State*, 473 S.W.3d 889, 902 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd). A defendant is not entitled to make a jury argument that misstates the law or is contrary to the court's charge. *See Thomas v. State*, 336 S.W.3d 703, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). We determine de novo whether a defendant has misstated the law during jury argument. *See id.*

"[P]roper jury argument generally falls within one of four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement." *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). "To constitute reversible error, the argument must be manifestly improper or inject new, harmful facts into the case." *Jackson*, 17 S.W.3d at 673.

21

"Counsel is entitled to correctly argue the law, even if the law is not included in the jury charge." *Vasquez v. State*, 484 S.W.3d 526, 531 (Tex. App.—Houston [1st Dist.] 2016, no pet.). "Prohibiting defense counsel from making a particular jury argument when counsel is entitled to do so is a denial of the defendant's right to counsel." *Id.* "However, neither the State nor the defense may use closing argument as a vehicle to place before the jury evidence that is outside the record." *Id.*

In issue two, Carter claims the trial court erred by sustaining the State's objection to a portion of Carter's closing argument in which Carter argued that there was no video recording of the events surrounding the shooting because the video would have shown that Daniel had a pistol:

> [Counsel for Carter]: So it's sort of, but part of it is let's get rid of, let's get rid of brother. Let's get rid of William Dale Carter. Get him out of here some way. Just make him uncomfortable. Let's run out there with a tape recorder. How would anybody like that? Somebody wants to talk to him they run up there with a tape recorder. And in this instance, the testimony from William Dale Carter is they came up there, okay. They didn't want him driving. They wanted him to stop. They're coming out there to the truck, get up there in the window, so the brother-in-law's up here leaning on the truck window --
>
> [State]: I object to that not being supported by the evidence, Judge.
>
> [The Court]: Sustained.
>
> [Carter's counsel]: Okay. So, and so, anyway, here's the sister, Brenda, she's got her phone. Most of these phone people take pictures, the video, and sound and video. Anyway, we hadn't seen any video from that. She says it's just sound. But we say maybe, maybe the reason there's no video is because her husband had a pistol.

22

[State]: I object to that also as being unsupported by the evidence, Judge.

[Carter's counsel]: It's in the record, Judge.

[State]: It's not, and I respectfully object.

[The Court]: Sustained.

Carter contends that that there was evidence in the record that Brenda had her phone in her hand, and based on that evidence, Carter's counsel made a reasonable deduction that there was no video because it would have supported Carter's version of the events that Daniel had a pistol and Carter shot Daniel to defend himself. But in the absence of any evidence to support Carter's assertion there was no video because it would have shown Daniel had a pistol, the trial court may have reasonably concluded Carter's theory was mere speculation. We conclude the trial court was within its discretion to sustain the State's objection, and we overrule Carter's second issue.

In issue three, Carter complains the trial court erred by sustaining the State's objection to a portion of Carter's closing argument in which Carter argued Daniel's intention to kill Carter:

> [Counsel for Carter]: So here's one bullet from a pistol. Here's another bullet from a pistol. And this one right here right above, right above the driver's, what was that, four inches above maybe the driver's head? So this could have easily been, this could have easily been the death of William Carter in this case. Easily, he could have been killed. This is what's in the mind, this right here, this right here is what Mr. Brother-

23

in-law, [Daniel], this is his intention. This was [Daniel's] intention right here.

So it is really so difficult to say that William Carter believes his brother-in-law is going to kill him? Because this shows what his intent. This is the real thing. This is shotgun shell. One, boom, boom, boom, boom. I think he said 15 times, whatever it was. This is 12-gauge right at his truck as he's driving by. And not even, he's not shooting back at this point. He's driving the truck. He's not shooting that powder gun at this time. The guy just, the brother-in-law wants to kill him. That's not even, that's not justified right there. So that's what's going on.

[State]: I object to that being also a misstatement of the law, Judge. All of this happened after he shot him with a bullet in his chest, and I respectfully object.

[Trial court]: Sustained.

Carter complains that the trial court improperly sustained this argument because Carter testified during trial that he and Daniel had a bad relationship and that his reason for shooting Daniel was because he believed Daniel was reaching for a small gun behind his back. We agree that this was proper jury argument. Carter's jury argument in this instance was proper because it was a summation of the evidence and a reasonable inference from the evidence.

Nevertheless, we conclude that if the trial court erred, any such error was harmless. The denial of the right to counsel is constitutional error that is subject to a harm analysis under Rule 44.2(a) of the Texas Rules of Appellate Procedure. *Vasquez*, 484 S.W.3d at 532 (citing Tex. R. App. P. 44.2(a)). An appellate court "must reverse a judgment of conviction or punishment unless the court determines

24

beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Tex. R. App. P. 44.2(a). "In applying the harmless error test, the primary question is whether there is a 'reasonable possibility' that the error might have contributed to the conviction or punishment." *Vasquez*, 484 S.W.3d at 532 (quoting *Mosely v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998)).

The State made its objection after Carter made his argument to the jury that the evidence showed Daniel's intention was to kill Carter. The trial court merely sustained the State's objection; it did not instruct the jury to disregard the argument. Assuming without deciding the trial court erred in sustaining the State's objection, any such error was harmless since the record does not reveal the extent to which defense counsel intended to continue or expound upon this argument. *See Wilson*, 473 S.W.3d at 902-03 (holding any error committed by the trial court in sustaining the State's objection to the pertinent portions of the closing argument of the defendant's trial counsel was harmless because the trial court did not instruct the jury to disregard the argument); *Price v. State*, 870 S.W.2d 205, 209 (Tex. App.—Fort Worth), *aff'd*, 887 S.W.2d 949 (Tex. Crim. App. 1994) ("Where the record does not fully demonstrate to the reviewing court what counsel would have argued but for an objection, no demonstration of harmful error is made."). We overrule Carter's third issue.

25

In his fourth issue, Carter complains the trial court improperly sustained the State's objection to the following argument:

> [Carter's counsel]: So who owns the property out there? You'd have to get a title company to run, you'd have to do a lot of legal research, title research who owns this or that --
>
> [State]: I'm going to object to all of that too. None of that came out. There wasn't a word of evidence about that. I respectfully object.
>
> [Trial court]: Sustained.

Carter complains that the evidence admitted at trial showed that there was conflict between the parties regarding whether or not Carter had an easement on the driveway where he shot Daniel. But, again, even if we were to assume the trial court erred in sustaining the State's objection, we conclude any such error was not harmful because there was no instruction by the trial court to disregard the argument preceding the objection, and there is nothing in the record showing what Carter's counsel would have argued but for the trial court's ruling on the objection. *See Wilson*, 473 S.W.3d at 902-03; *Price*, 870 S.W.2d at 209. We overrule Carter's fourth issue.

In his fifth issue, Carter complains the trial court improperly sustained the State's objection to the following argument:

> [Carter's counsel]: Okay. So, now, he's not obligated, nobody's obligated to retreat. Texas law. A person who, a person provoked doesn't have to retreat. Presumption of reasonable belief, reasonable belief that he's in that kind of danger applies unless the State proves beyond a reasonable doubt that the facts giving rise to a presumption

26

do not exist. That really doesn't apply because he's thinking he's in serious danger. So that's where you are.

Now, another part of this that's important it's your duty to consider all relevant facts and circumstances surrounding the shooting and the previous relationship existing between the accused and the defendant. What's their relationship? That all came in. You got to consider that with all the relevant facts and circumstances going to show the condition, the condition of the mind of the accused at the time of the alleged offense. So it's what Mr. Carter believes based on all this stuff that's been going on.

[State]: That's also a misstatement of the law, and I object. It's what a reasonable person believes.

[Trial court]: Sustained.

[Carter's counsel]: Okay. So, anyway, you've got the instruction and can read that, so forth and so on. And so the Court's telling you if you find from the evidence or have a reasonable doubt thereof that the defendant reasonably believed that deadly force when and to the degree used was immediately necessary, that the defendant reasonably believed, this is written down here, that the defendant reasonably believed deadly force when and to the degree used --

[State]: That's a misstatement of the law, and I respectfully object.

[Carter's counsel]: I'm reading from the jury charge.

Consistent with the Texas Penal Code, the trial court's charge gave the jury the following instructions on self-defense and the use of deadly force:

> Upon the law of self defense, you are instructed that a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force.
>
> The use of force against another is not justified in response to verbal provocation alone.

27

A person is justified in using deadly force against another:

(1) if the person would be justified in using the force against the other; and

(2) when and to the degree the person reasonably believes the deadly force is immediately necessary:

(A) to protect himself against the other's use or attempted use of unlawful deadly force; or

(B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

[…]

A person who has a right to be present at the location where the deadly force is used, who has not provoked the person against whom the deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force and the finder of fact, when determining whether the actor reasonably believed that the use of deadly force was necessary, may not consider whether the actor failed to retreat.

[…]

You are further instructed that it is your duty to consider all relevant facts and circumstances surrounding the alleged offense and the previous relationship existing between the accused and the complainant, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the alleged offense.

Now, therefore, bearing in mind the foregoing definitions, instructions and presumption, if you believe from the evidence beyond a reasonable doubt that the defendant, WILLIAM DALE CARTER in San Jacinto County, Texas Texas, [sic] on or about the 23rd day of October 2022,

28

did then and there intentionally or knowingly cause serious bodily injury to [Daniel]. [sic] by shooting him with a black-powder pistol as alleged in the indictment; but you further find from the evidence, or have a reasonable doubt thereof, that the defendant reasonably believed, or is presumed to have reasonably believed that deadly force when and to the degree used, if it was, was immediately necessary to protect himself against the use or attempted use of unlawful deadly force by the said [Daniel]; you will acquit the defendant and say by your verdict "not guilty."

*See* Tex. Penal Code Ann. §§ 9.31(a), 9.32(a). The jury charge defined "reasonable belief" to mean "a belief that would be held by an ordinary and prudent person in the same circumstances as the defendant." "The 'reasonably believe' language contains subjective and objective components." *Lozano v. State*, 636 S.W.3d 25, 32 (Tex. Crim. App. 2021). "A defendant must subjectively believe that another person used or attempted to use unlawful force (Section 9.31) or deadly force (Section 9.32) against the defendant and that the defendant's use of unlawful or deadly force in response was immediately necessary." *Id.* "Second, a defendant's subjective belief must be reasonable." *Id.* "A reasonable belief is one held by an "ordinary and prudent man in the same circumstances as the actor."" *Id.* (quoting Tex. Penal Code Ann. § 1.07(a)(42)).

The portion of defense counsel's argument addressing the subjective component of the definition of "reasonable belief" could be considered a "misstatement of the law" only to the extent it failed to address the objective component, but after the objection, defense counsel proceeded to address the

29

objective component. Taken as a whole, the argument does not misstate the law, and although the trial court sustained the objection, the trial court did not instruct the jury to disregard any portion of the argument, nor does the record reveal that defense counsel was prevented from making any additional arguments addressing the issue. *See Wilson*, 473 S.W.3d at 902-03; *Price*, 870 S.W.2d at 209; *Joiner v. State*, No. 08-18-00118-CR, 2020 Tex. App. LEXIS 6462, at \*53 (Tex. App.—El Paso Aug. 13, 2020, pet. ref'd) (not designated for publication) ("[T]here is no improper restriction on a defendant's jury argument amounting to a denial of counsel where the defendant is able to convey the gravamen of his argument to the jury despite the trial court's curtailment of a particular portion of his argument."). After the objection, defense counsel continued to address self-defense and the use of deadly force, directing the jury's attention to the charge which included both the subjective and objective components of "reasonable belief." On this record, we cannot conclude there is a reasonable possibility that the trial court's sustaining of the State's objection may have contributed to the conviction or punishment. *See Vasquez*, 484 S.W.3d at 532. We overrule Carter's fifth issue.

Issue Six: Extraneous Offenses

In his sixth issue, Carter complains that the prosecutor denied him a fair and impartial trial by injecting extraneous, unproven offenses into the record. Carter asks us to consider his arguments he made in issue one, subpoint three. Carter does not

30

advance any new arguments in his sixth issue as to how or why he was denied a fair trial. Given our resolution in issue one, subpoint three, we overrule Carter's sixth issue.

## Issue Seven: Jury Charge

In his seventh issue, Carter complains that the trial court committed reversible error in the guilt phase jury charge by not defining the offense as strictly a result-of-conduct offense. Specifically, he complains that the trial court defined the terms "intentionally" and "knowingly" in the jury charge to include both the nature-of-conduct and result-of-conduct definitions. Where an appellant raises jury-charge error on appeal, the degree of harm necessary for reversal depends on whether the appellant preserved the error by a timely objection at trial. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). When, as here, the defendant fails to object or states in the trial court that he has no objection to the charge, we will not reverse for jury charge error unless the record shows "egregious harm" to the defendant. *See State v. Ambrose*, 487 S.W.3d 587, 595 (Tex. Crim. App. 2016) ("[U]npreserved jury-charge error does not require a new trial, even when the error is complained of in a motion for new trial, unless the error causes 'egregious harm.'"); *Ngo v. State*, 175 S.W.3d 738, 743-44 (Tex. Crim. App. 2005) (citing *Bluitt v. State*, 137 S.W.3d 51, 53 (Tex. Crim. App. 2004); *Almanza*, 686 S.W.2d at 171. "Errors that result in egregious harm are those that affect the very basis of the case, deprive the defendant

of a valuable right, or vitally affect a defensive theory." *Ngo*, 175 S.W.3d at 750 (internal quotations omitted). An appellant must have suffered actual harm, not merely theoretical harm. *See Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012) (citing *Arline v. State*, 721 S.W.2d 348, 352 (Tex. Crim. App. 1986)).

We review jury charge error by a two-step process. *Ngo*, 175 S.W.3d at 744. First, we determine whether error exists in the jury charge. *Id.* Second, we determine whether sufficient harm was caused by the error to require reversal. *Id.* To determine whether egregious harm resulted, we examine "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171.

Section 6.03 of the Texas Penal Code sets out four culpable mental states – intentionally, knowingly, recklessly, and criminally negligent. *Price v. State,* 457 S.W.3d 437, 441 (Tex. Crim. App. 2015). In the jury charge, the language regarding the culpable mental state must be tailored to the conduct elements of the offense. *Id.* A trial court errs when it fails to limit the language regarding the applicable culpable mental states to the appropriate conduct element. *Id.* If the gravamen of an offense is the result of conduct, the jury charge on culpable mental state should be tailored to the result of conduct and likewise for nature-of-conduct offenses. *Id.* However, if the offense has multiple gravamina, and one gravamen is the result of conduct and

32

the other is the nature of conduct, the jury charge on culpable mental state must be tailored to both the result of conduct and the nature of conduct. *Id.*

A person commits the offense of aggravated assault if he intentionally, knowingly, or recklessly causes bodily injury to another and uses or exhibits a deadly weapon during the commission of the assault. Tex. Penal Code Ann. § 22.01(a)(1), 22.02(a)(2). Aggravated assault is a result-oriented offense. *Landrian v. State*, 268 S.W.3d 532, 537 (Tex. Crim. App. 2008). "It is error for a trial judge to not limit the definitions of the culpable mental states as they relate to the conduct elements involved in the particular offense." *Cook v. State*, 884 S.W.2d 485, 491 (Tex. Crim. App. 1994). Nevertheless, if the application paragraph of the jury charge points the jury to the appropriate portions of the definitions, an error in providing definitions that do not limit the jury to considering only the results of the defendant's conduct is considered harmless error. *Patrick v. State*, 906 S.W.2d 481, 493 (Tex. Crim. App. 1995) (en banc); *Hughes v. State*, 897 S.W.2d 285, 296-97 (Tex. Crim. App. 1994).

Here, the jury charge defined "intentionally" and "knowingly" as follows:

A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

33

In this case, the charge's definitions of "intentionally" and "knowingly" mirrored the definitions in the Texas Penal Code and did not limit the jury's consideration to whether Carter intended or acted with knowledge regarding the result of his conduct. *See* Tex. Penal Code Ann. § 6.03(a), (b). However, the application paragraph of the charge instructed the jury to find Carter guilty if he "intentionally, knowingly, and recklessly cause[d] serious bodily injury to [Daniel], by shooting [Daniel] in the chest with a black-powder revolver, and did then and there use or exhibit a deadly weapon, namely a black-powder revolver[.]" Because the application paragraph limited the jury's consideration to whether Carter acted with the requisite state of mind regarding the result of his conduct, we are confident the jury's decision to find Carter guilty was based on the result of his conduct. We conclude that the facts, as applied to the law in the application paragraph of Carter's jury charge, pointed the jury to the appropriate portions of the definitions of the terms intentionally and knowingly.

Carter does not direct us to any evidence, nor any argument of counsel, that Carter could have intended the nature of his conduct (shooting Daniel in the chest) without intending or being reasonably certain about the result of his conduct (causing serious bodily injury). Rather, Carter's defense was that he shot Daniel in self-defense because he believed Daniel was reaching for a gun. The charge's abstract definitions of "intentionally" and "knowingly" did not affect the very basis of the

34

case, deprive Carter of a valuable right, or vitally affect his defensive theory. *Ngo*, 175 S.W.3d at 750. Therefore, we conclude that the trial court's failure to limit the definitions of those terms did not result in egregious harm. *Patrick*, 906 S.W.2d at 492-93; *Hughes*, 897 S.W.2d at 296-97; *Coleman v. State*, 279 S.W.3d 681, 686-87 (Tex. App.—Amarillo 2006), *aff'd*, 246 S.W.3d 76 (Tex. Crim. App. 2008). We overrule Carter's seventh issue.

## Conclusion

Having overruled all of Carter's issues, we affirm the judgment of the trial court.

AFFIRMED.

KENT CHAMBERS
Justice

Submitted on August 22, 2025
Opinion Delivered January 7, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Chambers, JJ.